UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                                     :
                                                          :
FIRST REPUBLIC GROUP REALTY, LLC.      :      Chapter 11
                                                          :      Case No. 09-13983 (MG)
                              Debtor.      :      (Jointly Administered)
                                                          :
------------------------------------------------------------x
                                                          :
AMUSEMENT INDUSTRY, INC. and            :
PRACTICAL FINANCE CO.,                        :      Adv. Pro. 09-01516 (MG)
                                                          :
                              Plaintiffs,      :
                                                          :
            - against -                           :
                                                          :
CITIGROUP GLOBAL MARKETS REALTY     :
CORP. and FIRST REPUBLIC GROUP REALTY, :
LLC                                                   :
                                                          :
                              Defendants      :
------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY
INJUNCTION**

**A P P E A R A N C E S :**

SILVERMAN ACAMPORA, LLP
*Attorneys for the Debtor First Republic Group Realty, LLC*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By: Jay S. Hellman, Esq.
By: Lon J. Seidman, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
*Attorneys for Citigroup Global Markets Realty Corp.*
1177 Avenue of the Americas
New York, NY 10036
By: Ronald S. Greenberg, Esq.

ARENT FOX LLP
*Attorneys for Amusement Industry, Inc. and Practical Finance Co.*
1675 Broadway
New York, New York 10019
By: Robert M. Hirsch, Esq.
By: Eugene R. Scheiman, Esq.
By: Mark A. Bloom, Esq.
By: Caroline Turner English, Esq.

ROBINSON BROG LEINWAND GREEN GENOVESES & GLUCK, P.C.
*Attorneys for the Official Committee of Unsecured Creditors*
1345 Avenue of the Americas
New York, New York 10105-0143
By: Robert R. Leinwand, Esq.

HELLER HOROWITZ & FEIT, P.C.
*Attorneys for Mark Stern*
292 Madison Avenue
New York, NY 10017
By: Eli Feit, Esq.


**MARTIN GLENN**
**United States Bankruptcy Judge**

On June 22, 2009, First Republic Group Realty LLC (the "Debtor") filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been

appointed and the Debtor continues to operate as a debtor-in-possession pursuant to Sections

1107 and 1108 of the Bankruptcy Code.

Plaintiffs Amusement Industry, Inc. ("Amusement") and Practical Finance Co.

("Practical Finance") (together, "Amusement") filed the complaint in this action on October 13,

2009.  Plaintiffs' allege that the Debtor misappropriated $13 million in funds belonging to the

Plaintiffs from an escrow account where the Plaintiffs deposited the funds in anticipation of a

transaction that the Plaintiffs were negotiating with the Debtor.  (Compl. ¶ 31.)[1]  Plaintiffs

brought the present motion on October 23, 2009, seeking a preliminary injunction to prevent the

---

[1]        References to "Compl." refer to the Amended Complaint, filed on October 16, 2009 (ECF # 4).

Debtor from utilizing funds traceable to Amusement's escrow deposit that are currently on deposit in the Debtor's reserve accounts.

The Court conducted an evidentiary hearing on November 17, 2009, and heard argument on November 18, 2009.  The following constitute the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a) made applicable to this adversary proceeding by FED. R. BANKR. P. 7052.  For the reasons provided below, the Court denies the preliminary injunction. Plaintiffs have failed to establish irreparable injury or probability of success on the merits.[2]

## I.    JURISDICTION

The Court has jurisdiction to hear this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    BACKGROUND

### A.    The Parties

Amusement is a California corporation doing business as Westland Industries, Incorporated, conducting business from its principal place of business in Long Beach, California. Practical Finance is a California corporation, conducting business from its primary place of business in Long Beach, California.  Practical Finance is a California-licensed finance lender.

Amusement and Practical Finance together constitute a commercial real estate investment, brokerage and management business owned and managed by members of the Alevy

---

[2]    This case is one of many currently pending in federal district court and New York state court between many of the individuals or entities who are involved but who are not parties in this case arising from the same transactions or occurrences.  The Court, in denying the preliminary injunction here, only resolves a limited number of factual and legal issues between the parties in this case.

family, including Allen Alevy and his children, Stacey Alevy Sragow and Steven Alevy, as well

as the Alevy Family Trust, for which Allen Alevy is Trustee and Steven Alevy is one of several

beneficiaries.  Allen Alevy was and is Amusement's Chief Financial Officer and primary

decision-maker.

Allen Alevy's son, Steven Alevy, in addition to his status as a shareholder of

Amusement, is also a principal and the President of Bankers Capital Realty Advisors ("Bankers

Capital"), a New York-based real estate financing and brokerage firm and the New York-based

financing arm of Amusement.  (D. Ex. C.)[3]

Defendant First Republic Group Realty LLC ("First Republic Group Realty") is a

Delaware limited liability company whose principal place of business is in New York City.  (P.

Ex. 8 at 1.)  Mark Stern ("Stern") is First Republic Realty Group's principal.  FRGR Managing

Member LLC, a Delaware limited liability company, is the sole holder of First Republic Group

Realty's interests and its managing member.[4]  (D. Ex. HH.)  First Republic Group Realty entered

into a contract to purchase and own eleven shopping center properties in the southeastern United

States from Colonial Realty Limited Partnership ("Colonial").

This action concerns $13 million that Amusement deposited into an escrow account in

July 2007, to allow Amusement to participate in First Republic Realty Group's purchase of

eleven shopping center properties from Colonial.  Amusement alleges that the $13 million was

---

[3]      Defendant's trial exhibits are identified as "D. Ex. [letter]"; Plaintiff's trial exhibits are identified as "P. Ex.
[number]."  The parties stipulated to the admissibility of all trial exhibits.  References to the trial transcript are
identified as "[volume]T:[page]."  The direct trial testimony of most witnesses was admitted by declaration and the
declarations are identified as "[witness] Decl. _."

[4]      FRGR Managing Member LLC ("FRGR") is also a debtor in this Court.  *See* Case No. 09-11061(MG),
filed on March 9, 2009.  Originally filed as a case under chapter 11, on November 16, 2009, I granted the motion of
the United States Trustee, converting the case to a case under chapter 7.  For the background surrounding the filing
of the FRGR and First Republic Group Realty bankruptcy cases, *see FRGR Managing Member LLC*, Case. No. 09-
11061(MG), 2009 WL 3816674 (Bankr. S.D.N.Y. November 16, 2009).

improperly released from escrow without Amusement's consent.  Amusement accordingly

moves this Court for a preliminary injunction to prevent First Republic Group Realty from

utilizing and depleting funds in First Republic Group Realty's reserve accounts that are traceable

to Amusement's escrow.  The parties stipulated that $3,675,535.41 of the original $13 million

can be traced to and is still being held in the reserve accounts.  (Stip. Facts at ¶ 13.)  Amusement

argues that the funds are now at risk of being depleted, threatening Amusement with irreparable

injury.[5]

**B.      The Transaction and Release of Funds**

   1.   First Republic Seeks Financing to Purchase Colonial's Property Portfolio

On April 20, 2007, First Republic Group, Corp., through its principal, Stern, as buyer,

entered into a written contract to purchase from Colonial, as seller, a portfolio of eleven

shopping center properties located in Alabama, Georgia, North Carolina, and Virginia (the

"Portfolio").  (Decl. of Robert M. Hirsch in Support of Plaintiff's Motion for a Preliminary

Injunction and Temporary Restraining Order, dated October 23, 2009, Ex. #2) (ECF # 6).)  The

parties' sale contract set the Portfolio's purchase price at $128,000,000.00.  (*Id*. at Art. 3.).  The

closing was scheduled to take place no later than June 15, 2007.  (*Id*. at Art. 1.)

From the time that the contract with Colonial was signed until the closing for the

Portfolio occurred, First Republic Realty Group and its principals either lacked sufficient

personal assets or were unwilling to use their own assets to enable the Debtor to purchase the

Portfolio.  Therefore, to purchase the Portfolio, Stern initially utilized seller financing from

Colonial, and First Republic Group Realty's purchase of the property initially closed on June 30,

---

[5]        The Debtor has sought Court approval for use of cash collateral, including the funds held in the reserve
accounts that are traceable to Amusement's initial $13 million escrow deposit.

2009.  (1T:99-100.)  Stern sought to obtain third-party financing to replace Colonial's financing

for the Portfolio's purchase.  (*Id.*)

Stern then obtained primary third-party financing from Citigroup Global Markets Realty

Corp ("Citigroup") in a two-tier structure: First Republic Realty Group executed a loan

agreement with Citigroup for $111.15 million, secured by the Portfolio (the "Loan Agreement"),

and First Republic Realty Group's managing entity, FRGR, executed a mezzanine loan

agreement with Citigroup for $15 million, secured by FRGR pledging 100% of First Republic's

ownership interests (the "Mezzanine Loan Agreement"), for a total debt of $126.15 million.  (P.

Ex. 8 at § 1.1; D. Ex. CC at 1-2.)  Under the terms of both the Loan Agreement and Mezzanine

Loan Agreement, the following provisions applied:

   i.   Loan proceeds were distributed by Citigroup only to pay obligations concerning the

purchase transaction by First Republic Group Realty LLC of the Portfolio from Colonial, and

were prohibited to be paid to any affiliate of the borrowers.  (*Id.* at § 5.2.9.)

   ii.   The borrowers agreed they had not entered into any other transaction that would

interfere with the loan transactions.  (*Id.* at §§ 4.1.3, 4.1.5.)

   iii.   The loans could not be refinanced/prepaid for a period of about 180 days, from funding

through approximately January 10, 2008.

   iv.   Borrowers' management and ownership structure could not be changed without the

prior consent of Citigroup.  (*Id.* at § 4.1.35.)

   v.   The borrowers' principals were required to own, at all times, at least 51% of the

borrowers.

   vi.   First Republic Group Realty could not transfer any part of the property portfolio

without the prior consent of Citigroup.  (*Id.* at § 5.2.10.)

vii.   Events of default included: (1) incurring new debt (*id.* at § 5.2.1), (2) pledging assets to a third party (*id.* at § 5.2.10), and (3) any transfer of a property within the Portfolio without Citigroup's prior consent.  (*Id.*)

In June 2007, Stern understood that the funds that First Republic Group Realty and FRGR received from Citigroup would be insufficient by themselves to refinance First Republic Group Realty's purchase of the Portfolio from Colonial and that Stern had to obtain additional third-party financing.  (1T:67.)  As part of his efforts to obtain financing and structure First Republic Realty Group's acquisition of the Portfolio, Stern retained Stephen Friedman ("Friedman"), then a real estate partner at Buchanan Ingersoll & Rooney, P.C.  (1T:179-81.) Friedman was referred to Stern by Ephraim Frenkel ("Frenkel), a lawyer who ran a title and escrow company known as Land Title Associates ("LTA"), who had worked with Friedman on several prior matters.  (1T:180.)

In May 2007, to help Stern obtain additional third-party financing to complete the purchase of the Portfolio, Friedman introduced Stern to Steven Alevy, President of Bankers Capital.  In June 2007, Steven Alevy discussed with his father, Allen Alevy, the idea of the Alevy family's possible financial participation in the deal.  (S. Alevy Decl. at ¶ 4.)  Allen Alevy testified that although he was initially skeptical about participating in the deal, the involvement of Friedman, a family friend who had handled the Alevy family's transactions in the past and who claimed to have worked with Frenkel, the escrow agent, and the involvement of Joshua Safrin ("Safrin"), who Allen Alevy deemed a "substantial and well known New York real estate investor," persuaded Allen Alevy to also participate in the deal.  (A. Alevy Decl. at ¶ ¶ 5-8.)

2.  The Parties' June 29, 2007 Letter of Understanding

On or about June 29, 2007,[6] Steven Alevy, on behalf of Amusement, and Mark Stern, on

behalf of First Republic, entered into an agreement (the "Letter of Understanding") for the

purchase of equity in First Republic Group, the entity that was then designated to own the

Portfolio properties.  (D. Ex. D.)  The agreement provided that:

i.    "[Amusement] will provide $13,000,000 for a 50% equity and voting interest in [the

entity holding the Portfolio] and a 12% annual preferred return payable on a monthly basis";

ii.   "7% paid current (set at 165 basis points over the 30 day LIBOR rate) and the balance

will accrue if necessary";

iii.   An agreement for the investment would be agreed upon in seven days, and until then

Amusement would hold 100% of the ownership in the entity formed to acquire the property

portfolio; and

iv.   Once the partnership agreement was drafted, Amusement would become a 50% owner

of the entity formed to acquire the property portfolio.

(*Id.*)

After Stern signed the Letter of Understanding, Amusement arranged for a $13 million

wire to an LTA escrow account which Frenkel would manage.  On June 29, 2007, Friedman

advised Frenkel by email that LTA would receive a $13 million wire transfer and that Frenkel

was not to release the funds until Frenkel received authorization from Stephen Friedman "and no

one else."  (D. Ex. F.)  Steven Alevy was copied on the email.  Frenkel, in turn, sent an email to

Friedman, with a copy to Steven Alevy, confirming that no funds would be released without

Friedman's authorization.  (*Id.*)  As explained below, however, in subsequent emails from Allen

---

[6]     The record is unclear whether the agreement, dated June 29, 2007, was actually signed by the parties on
June 29, 2007 or on July 2, 2007.  The record is also unclear what role Friedman played in drafting the Letter of
Understanding.  The Court need not resolve either issue.

Alevy or Allen Sragow to Frenkel and Friedman, Allen Alevy instructed Frenkel and Friedman

not to release funds from escrow without Allen Alevy's or Allen Sragow's written

authorization.[7]  On July 2, 2007, Amusement transferred $13 million to the escrow account.

(Stip. Facts. at ¶ 1.)

> 3.  <u>Subsequent Instructions from Amusement Regarding the Escrow's Release</u>

Whether or not Friedman ever represented Amusement in the transaction, Amusement

was clearly represented throughout the transaction by Allen Sragow ("Sragow") and Michael

Libraty ("Libraty") of the offices of Sragow & Sragow, a California law firm that handles much

of Amusement's legal work.  (1T:59-60, 135-36.)  Sragow is Allen Alevy's son-in-law.

(1T:185.)  Sragow testified that he "felt the need to ensure that control of Amusement's funds

was not solely, if at all, in Friedman's hands, and not at all in the principal of Land Title

Associates, Ephraim Frenkel's . . . hands."  (Sragow Decl. at ¶ 7.)

Accordingly, on July 9, 2007, after the wire transfer of Amusement's funds to the LTA

escrow account and several days before the release of funds from escrow, Sragow sent an email

to Friedman, stating: "Please do not authorize release of the $13,000,000 from the Alevys in

escrow without specific authorization from Allen Alevy or myself."  (P. Ex. 20.)  Friedman

replied by email, with a copy to Steven Alevy, confirming that he would comply with Sragow's

request.  (*Id.*)

---

[7]      The record is unclear about who Friedman represented in the transaction, and at what point in time.  Allen
Alevy testified that, until the funds were released from escrow on July 13, 2007, Allen Alevy believed that Friedman
represented Amusement in the transaction.  (1T:58-60.)  While Friedman represented the Alevys in other
transactions, it is not clear that he ever represented the Alevys in this transaction.  The Court need not resolve the
issue.  Allen Alevy testified that, on July 6, 2007, he sent an email to Friedman, recognizing that Friedman had the
authority with the escrow agent and that the escrow agent would not disburse the funds without Friedman's
authorization.  (1T:18-19.)  In another July 6, 2007 email, Allen Alevy instructed Friedman not to release the funds
without Allen Alevy's authorization: "Since escrow cannot release the $13,000,000 to Mark Stern, First Republic
Group or Colonial Capital without your written permission regarding the Colonial Capital Properties; I am
instructing you:  **Do not release that $13,000,000 without my written permission**."  (P. Ex. 18) (emphasis in
original).

On July 10, 2007, Sragow also sent an email to Frenkel, with copies to Friedman, Steven

Alevy, and Allen's Alevy's secretary,[8] identifying himself to Frenkel as Allen Alevy's and

Amusement's California counsel.  The email stated: "Please do not release any of the

$13,000,000.00 without written authorization from my office."  (D. Ex O.)  After not receiving a

reply from Frenkel, Sragow called Frenkel's office and relayed instructions concerning the

escrow's release to Frenkel's secretary.  (P. Ex. 31.)

As late as July 12, 2009, Sragow sent a fax to Frenkel's office, with a copy to Friedman,

stating: "I have emailed and faxed instructions to escrow such that the $13,000,000 may not be

released without written release from my office."  (*Id.*)  In a July 13, 2009 email, Frenkel

acknowledged that he had received and understood Sragow's instructions.  (D. Ex. O.)

    4.  Amusement Renegotiates the Agreement

On June 30, 2007, Stern held the closing of First Republic Group Realty's purchase of

the Portfolio from Colonial with seller financing from Colonial (the "First Closing").  (1T:99-

100.)  A second closing, after Citigroup and Amusement provided Stern with the third-party

financing necessary to replace Colonial's seller financing, was scheduled to occur on July 13,

2007 (the "Second Closing").  (1T:102-03.)

On July 9, 2007, shortly after Stern held the First Closing and signed the Letter of

Understanding with Amusement and before Stern was to hold the Second Closing, Sragow sent

an email to Friedman and informed Friedman that Amusement would require an agreement

assigning the purchase agreement from First Republic Group Realty, the entity that the Letter of

Understanding had originally designated as the entity that would own the Portfolio, to "Westland

---

[8]        Allen Alevy's emails were addressed to the email address of his secretary, Anna Chase.  (1T:18-19; A.
Alevy Decl. at ¶ 4; *see also* 1T:142.)

Industries Southeast LLC," a California limited liability company that Amusement was forming.

(D. Ex. KK.)

Friedman, taken aback by what appeared to be Amusement's last-minute maneuvering,

resisted such a revision of the parties' agreement. In a reply to Sragow's email, Friedman wrote:

> Are you kidding? That is not going to happen. The deal is about to close and all docs,
> opinions, org charts, etc. have been completed and signed off by the bank. It is beyond
> late in the game to even think about having the purchase agreement assigned. Not going
> to happen or even be considered.

(*Id.*)

Friedman was particularly concerned by Allen Alevy's apparent about-face and decision

to take a frontal role in the transaction, which would require Allen Alevy "to disclose to Citibank

that he is a partner and . . . to sign on the carveouts" that would ensure that Allen Alevy's

addition to the deal would not violate the terms of Citigroup's Loan Agreement. (*Id.*) Sragow

replied: "How did you intend to get Al his 50% while avoiding the carveouts?" (*Id.*)

Both Sragow and Libraty attempted to ease Friedman's fears that Amusement's new

requirement would prevent the parties from closing. Sragow wrote that the purchase

agreement's assignment to the new Amusement entity "can take place after closing." (P. Ex.

22.) Echoing Sragow, Libraty stated that "[i]f timing of assignment is a problem, note the

purchase agreement already has seller giving First Republic right to assign the agreement to an

LLC where First Republic has some control, which is exactly our situation." (*Id.*) Libraty

acknowledged, however that, "if [First Republic] cannot assign the contract any longer pre-

closing, there of course needs to be assignment of what First Republic picks up from seller to the

LLC one minute after closing, so an assignment agreement still needs to be drafted and signed

before closing." (*Id.*)

On July 11, 2007, Stern signed a personal $13 million promissory note, payable to Amusement, for the Colonial transaction.  (P. Ex. 25.)  The promissory note was prepared by Sragow's office.  That day, at 4:34 p.m., Friedman sent Steven Alevy and Stern an email, with a copy to Libraty, attaching copies of the escrow agreement, the promissory note and the assignment of interests.  (D. Ex. H.)  A separate email, containing the Portfolio deeds, was sent by one of Friedman's associates to the same parties almost immediately thereafter.  (D. Ex. I.) Friedman sent a signed copy of the promissory note to Steven Alevy and Libraty at 5:31 p.m.  (P. Ex. 25.)

Shortly thereafter, at 5:46 p.m., Libraty sent an email to Friedman, with a copy to Steven Alevy, advising Friedman that Amusement no longer viewed the deal as a loan transaction.  (D. Ex. J.)  Libraty attached to the email a revised structure of Amusement's participation in the Colonial Deal, which provided, in part:

    i.    "There is no longer a loan.  The $13 million from [Amusement] is a straight contribution for the benefit of Mark Stern/Joshua Safrin so that the entities they control can purchase the 11 properties from Colonial Realty."[9]

    ii.    "In return for this benefit provided by [Amusement] to Stern/Safrin, Stern/Safrin shall before closing sign 11 grant deeds post-dated to date of closing from FIRST REPUBLIC GROUP REALTY LLC . . . to [Amusement]."

    iii.    ". . . [Amusement] has 45 days to receive return of $15 million for having contributed $13 million to close the purchase . . . ."

---

[9] The Court finds that the proposed transaction ultimately remained a loan.  Indeed, Sragow testified:
    Q: And the concept changed such that the deal was proposed to be a 13 million dollars loan?
    A: Yes.
    Q: And then it changed again such that Amusement advised on July 11, 2007 that it was no longer a loan but rather a straight contribution for the benefit of Mark Stern, among others; right?
    A: That was said but I don't think that was really a change in the concept of the deal.
(1T:138.)

iv.  "If within 45 days after closing/concurrent assignment [Amusement] does NOT get its $15 million, there is no assignment of anything back to Stern.  [Amusement] owns the entities forever without recourse, right, title or interest by Stern/Safrin."

(*Id.*)

Libraty advised Friedman that the two assignments Friedman created would need to be modified to comport with the Alevy family's revised structure, as described in the attached document.  (*Id.*)  Libraty closed by saying: "Add in the grant deeds described in my attachment and we're done."  (*Id.*)

As noted earlier, Allen Sragow sent a fax to Frenkel and Friedman on the morning of July 12, 2007, instructing Friedman and Frankel not to release the escrow funds without written authorization from Sragow's office.  (P. Ex. 31.)

Viewed charitably, less than a day or two before the scheduled closing, when Stern desperately needed Amusement's $13 million to close the transaction, Allen Alevy was attempting substantially to retrade the deal, changing the structure from a $13 million equity investment in the entity that would own the eleven shopping centers to a $13 million loan to Stern personally, secured by an assignment of all rights in the deal, and requiring Stern to repay not the $13 million actually advanced by Amusement, but $15 million, within 45 days (later changed to 60 days in the signed note).  (D. Exs. J, K;  A. Alevy Decl. ¶ 16-17.)  Stern was shocked to hear that Amusement was holding up the escrow's release, attempting to change the deal's terms and, as Stern understood it, "steal my deal."  (1T:103-04, 113-14.)  Stern called Friedman to complain about the "game . . . being played."  (1T:113-14.)  Stern had initially not wanted partners in the deal, but now Stern felt that he was stuck.  (1T:114.)  In an email sent to

Steven Alevy in the morning of July 12, 2007, Stern described the intense pressure that Citigroup

and the seller were placing on Stern to close the deal:

> Citi is going bunkers . . . . They want to see wires from our side . . . . I talked in Citi to
> take all the money and send everything to the seller to save the deal. Seller didn't get
> complete payment, he is requesting payment. Citi hasn't gotten any of the escrow
> payments and they claim that they will be in hot water. They have used the "F" word
> more than one time . . . . This is not an overstatement. I have everybody calling me . . . .
> This is soon [God forbid] falling out of hand.

(P. Ex. 29.)

Stern pleaded with Steven Alevy to release the escrow so that he could close the deal:

"Please, you must release the money by Frenkel so he can release it . . . . You have to keep your

word . . . . Please, please have it resolved . . . ." (*Id.*)

In accordance with the revised deal structure, on July 12, 2009, Stern signed the new $15

million promissory note (prepared by Sragow's office), with a 60-day term, interest at 8% and

default interest at 16%.[10]  (D. Ex. K.)  At 1:50 p.m., Stern confirmed by email to Steven Alevy

that "Everything is signed and notarized. I sent it to [Friedman]."  (P. Ex. 29.)  At 3:49 p.m.,

Friedman emailed a copy of the revised promissory note, signed by Stern, to Libraty and Steven

Alevy, stating: "See attached. Now, let's go." (D. Ex. L.).  Libraty immediately replied by

email, with a copy to Steven Alevy, advising Friedman that "[w]hen your office has all signed

originals of the 2 assignments and note and 11 deeds, written authorization to release will be

faxed to escrow."  Libraty requested that Friedman advise Libraty by email so that Libraty could

send out the release.  (*Id.*)  Friedman testified that he understood Libraty's email to mean that

Libraty wanted to ensure that the original documents had been delivered to Friedman before

authorizing the escrow's release.  (1T:191.)

---

[10]     No evidence or argument was offered whether a $13 million loan, with $15 million plus interest at 8%,
payable in 60 days, violated applicable usury laws.

After receiving Libraty's email, at 4:24 p.m., Friedman wrote a private email to Steven Alevy, asking: "I am telling him [Libraty] that I have them [the necessary documents], correct?" (D. Ex. L.)  Friedman acknowledged, however, that he did not in fact have all of the required original documents at the time of his email to Steven Alevy.  (1T:203.)  Friedman received the documents the following morning.  (1T:191.)  Friedman stated that, in his email to Steven Alevy, Friedman was actually inquiring whether Steven Alevy would agree to deceive Libraty to believe that Friedman in fact possessed the missing documents so that Libraty would release the escrow. (1T:203.)  The record does not, however, contain Steven Alevy's response.[11]

At 5:31 p.m., Friedman sent an email to Libraty and Steven Alevy, attaching copies of the signed and notarized deeds and the signed release and revised promissory note, and advising Libraty that "the originals [of all the signed and notarized deeds] are on their way to me having been picked up by messenger."  Friedman requested that Libraty direct that the funds be released.  (D. Ex. M.)

Finally, in an email sent at 7:56 p.m., sent to Friedman with a copy to Steven Alevy, with a subject line of "When we're ready for closing tomorrow, please tell Allen Alevy," Libraty advised: "I am in court tomorrow morning and I don't know when I return to the office.  Allen Sragow is not in the office tomorrow morning.  When you get confirmation of having original documents in possession, Allen Alevy can instruct staff here to fax the release authorization." (P. Ex. 66.)

---

[11]     This episode is another example of why the Court has substantial doubts about the credibility of the witnesses in this case.  Friedman and Steven Alevy were long-time friends.  It is not clear who agreed to carry out the deception.  It is clear that, with Friedman's knowledge and silent acquiescence, Steven Alevy authorized the release of the funds from escrow even though he knew that authorization had to come in writing from Allen Alevy or Allen Sragow.  Friedman did nothing to prevent the release of funds from escrow before Allen Alevy or Allen Sragow provided written authorization.

5. <u>The $13 Million is Released from Escrow for the Colonial Transaction</u>

Friedman received the signed originals on the morning of July 13, 2007.  At 11:19 am,

July 13, 2007,[12] Friedman sent an email to Sragow, Libraty, Allen Alevy and Steven Alevy,

stating: "YOU CAN RELEASE THE ESCROW."  (D. Ex. N.)  Friedman testified that he also

blind-copied Frenkel on the email "to give him a heads up that he ought to get ready to start the

wires."  (1T:193.)  A few hours later, at 2:48 p.m., Frenkel emailed Friedman asking whether

Friedman's email referred to the escrow deposited by Amusement for the Colonial transaction.

(D. Ex. N.)  Friedman immediately replied that it did, and expressed surprise that the escrow had

not yet been released.  (*Id.*)  Frenkel, in turn, replied that: "I received a phone call from Steven

Alevy, but no email and fax.  He also said he would have Sragow send something.  I really

would like a release from Steve and Sragow."  (*Id.*)  Friedman, in turn, replied: "You do need

[the release] from them."  (*Id.*)

Accordingly, several minutes later, at 2:59 p.m., Frenkel sent an email to Sragow, with

copies to Libraty, Friedman, Steven Alevy and Allen Alevy, stating: "Steve Alevy has verbally

authorized the release of the $13,000,000 we are holding.  Pursuant to your instructions, please

send me written authorization to release these funds."  (D. Ex. O.)  Sragow did not reply to the

---

[12]        The record is unclear whether funds were released from the escrow account for the Portfolio's purchase prior to July 13, 2007—specifically, on July 12, 2007.  On the one hand, emails between Citigroup representatives Paul Schuler and Amir Kornblum indicate that Frenkel received wiring instructions for First Republic's Wachovia account—to which the escrow funds were to be released—at 4:44 p.m on July 12, 2007.  (P. Ex. 39.)  Additionally, First Republic's LTA escrow account statement shows that approximately $7.8 million of Amusement's $13 million was withdrawn from the account on July 12, 2007.  (P. Ex. 49.)  However, the escrow account statement also shows that the account was replenished with approximately $6.24 million on July 13, 2007.  (*Id.*)  None of the July 12th descriptions list First Republic, Colonial or the account number listed in Citigroup's wiring instructions as the recipient of the released funds.  (*Id.*)  Finally, in an email sent at 5:17 p.m. on July 12, 2007, Stern wrote to Richard Koch, a Vice President of Northmarq Capital, that: "I don't know where I'll turn.  The rug has been pulled underneath me.  If the seller won't pay for it then they'll be after me from tomorrow on . . . .  They have put in time and money and they'll come claim it from me.  Now the seller is not paying for it because he did not get the money . . . ."  (P. Ex. At 30.)

email.  During his trial testimony, Sragow claimed that he was out of the office and did not see this email on July 13, 2009.  (1T:140-42; Sragow Decl. at ¶ 14.)

Approximately one hour later, at 3:57 p.m., Steven Alevy sent an email *only to Frenkel and Friedman*—as a reply to Frenkel's email to Sragow.  Steven Alevy stated: "You are hereby authorized to release 13,000,000 from escrow."  (D. Ex. P.)  Unlike the email to which he was replying, Steven Alevy did *not* copy Sragow, Libraty or Allen Alevy with his reply.[13]  At the evidentiary hearing, Friedman identified the document as the "the written authorization from Steven Alevy to release the 13 million dollars escrow."  (1T:193.)  Friedman testified that he believed at that time that, as a member of the Alevy family, Steven Alevy was authorized to release the escrow and assumed that, prior to issuing such a message, Steven Alevy had consulted other members of the Alevy family and "worked it out with whoever he needed to."[14]  (1T:194.)  Immediately after receiving Steven Alevy's email, Friedman sent an email reply to both Steven Alevy and Frenkel, with a congratulatory "Mazel Tov" that authorization for the release had finally been provided.  (D. Ex. WW.)  Notably, Friedman did not copy Sragow or Allen Alevy with this congratulatory email.

At 4:13 p.m., after Frenkel received Steven Alevy's message, Frenkel replied to Steven Alevy and advised: "A rep from citi is working with my bookkeeper.  Wires are going to fly in minutes if not less."  (Tr. Ex. P.)  Frenkel did not copy anyone with this email.  Steven Alevy did

---

[13]     The Court finds that this was a purposeful omission; a Reply to All would also have copied those individuals.  Steven Alevy must have decided *not* to advise Sragow, Libraty or Allen Alevy that he had authorized release of the funds from escrow.  Steven Alevy's trial testimony about this email was not credible:

    Q: When you sent your email to Frenkel, isn't it true you were trying to buy time?
    A:  I suppose that's true.
    Q:  You were trying to buy time, but then you got an email 16 minutes later from Frankel
    [advising that "wires are going to fly"]; isn't that right?
    A:  Yes.

(1T:170.)

[14]     In light of the emails that Friedman acknowledged receiving, stating that written authorization had to come from Allen Alevy or Sragow, Friedman's testimony on this point lacks credibility.

17

not object or otherwise reply to Frenkel's email.  (1T:172.)  Steven Alevy did not communicate

with his father, Allen Alevy, or with Sragow or Libraty.  (*Id.*)  Rather, Steven Alevy went home

and had dinner.  (*Id.*)

After Frenkel released the $13 million from escrow on July 13, 2007, First Republic

completed the closing on its purchase of the Portfolio for approximately $126 million.  A

substantial portion of Amusement's $13 million was deposited in various reserve accounts that

Citigroup required Stern and First Republic Group Realty to maintain.[15]

6.   Amusement's Conduct after the $13 Million was Released

a.   *Amusement Objects to the Release But Takes No Legal Action*

On Friday night, July 13, 2007, Librati sent an email to Allen Sragow, with a copy to

Steven Alevy, with a subject line of "Proposed list of closing items and their order, draft before

Monday."  (P. Ex. 40.)  The email contained a long list of items that had to occur before the

closing could take place.  (*Id.*)  The items included documents that had to be created and

documents that Libraty had previous suggested were not required prior to closing.[16]  (*Id.*)

---

[15]     Amusment's final instructions to Friedman, conveyed by Libraty in the July 12, 2007 email were:
"[w]hen your office has all signed originals of the 2 assignments and note and 11 deeds, written authorization will
be faxed to escrow."  (P. Ex. 31.)  Once Friedman received the originals of the required documents on July 13, all
conditions imposed by Allen Alevy (and Allen Sragow on behalf of Allen Alevy) were satisfied; at that point Allen
Alevy should have authorized the release of the $13 million from escrow.  In the face of the curious radio silence
from Allen Alevy and Steven Sragow, Steven Alevy then gave oral and written authorization to release the funds.
Whether Steven Alevy had actual or apparent authority to release the funds is disputed.  Steven Alevy gave the
written authorization even though he had received emails stating that only Allen Alevy or Steven Sragow could
authorize release of the funds.  Steven Alevy stood to receive a substantial fee if the transaction closed.  Stern's trial
testimony denying knowledge about when and how the funds were released from escrow, and how the funds were
disbursed, also was not credible.

[16]     Item #3 on the list reads "LLC formation documents for all 5 LLCs/operating agreements/minute
books/membership certificates."  (P. Ex. 40.)  In an email sent to Friedman on July 12, 2007, prior to closing,
however, Libraty suggested that these documents were *not* required *prior* to closing: "we could use a few LLC
documents for the 5 LLC structure used to hold title and debt . . . .  Please get to us as possible *upon closing*."  (P.
Ex. 66) (emphasis added).

On Sunday night, July 15, 2007, two days after the escrow was released and the

transaction closed, Sragow finally replied to Frenkel's request for Sragow's written authorization

for the funds' release.  (D. Ex. S.)  In an email to Frenkel, with copies to Friedman, Steven

Alevy, Libraty, and Allen Alevy, Sragow wrote that he was in "regular contact" with his office

and "was kept aware of the status of the closing" on July 13, 2007, but that "we did not receive

all of the documents necessary to release, and we did not provide written authorization" for the

funds' disbursement.  (*Id.*)  Purporting not to know whether the funds had been released from

escrow, Sragow instructed Frenkel:

> As soon as all of the documents are in I will let you know that we are ready to provide the
> written release.  If, by any error that took place Friday, the funds were released, do
> whatever is necessary to retrieve the funds, so that this does not become a much bigger
> problem that $13,000,000.[17]

(*Id.*)

The following day, July 16, 2007, after having learned that the funds were in fact

released,[18] Sragow wrote a letter to Frankel and Friedman, advising them that Amusement's

conditions had not been fulfilled prior to the funds' release and that Amusement's "money [was]

now in jeopardy."  (D. Ex. T.)  Sragow, however, raised the possibility of a subsequent

resolution and ratification of the release of the funds from escrow:

> Nevertheless, in an effort to avoid unnecessary expenditure of effort and further funds,
> we have once again listed the elements necessary for Amusement to now ratify the
> disbursement.  It is our understanding that the necessary parties are being assembled
> today to execute these documents, so with that in mind we present the list.  Within the
> enclosed items and events list, we ask you to modify earlier documents you prepared and
> to prepare two new documents, a reassignment agreement and a mutual release.  Please
> prepare all documents and provide for our review promptly.

---

[17]      The Court finds the reference in this email to funds being released "by any error" as questionable.  None of
the individuals involved in this transaction has been fully forthcoming.

[18]      On the morning of July 16, 2007, Steven Alevy emailed Sragow a copy of his July 13, 2007
communications with Efraim Frenkel, including Frenkel's email to Sragow requesting authorization, Steven Alevy's
response that Frenkel was "hereby authorized to release the $13,000,000 from escrow," and Frenkel's subsequent
communique that "Wires are going to fly in minutes if not less."  (D. Ex. P.)

(*Id.*)

After receiving no response from Frenkel, Sragow threatened legal action.  Sragow wrote
to Frenkel on July 27, 2007, stating that "I have learned that your office released the [$13
million] without authorization.  I have also learned that your office has failed to return any
remaining money and accrued interest."  (D. Ex.  U.)  Sragow stated that "[he] would rather not
file a complaint, but . . . no longer see any alternative," and advised Frenkel that "in view of this
new impending litigation, you are required to take steps to preserve all relevant evidence on
these issues . . . ."  (*Id.*)

After still not hearing back from Frenkel, Sragow contacted Frenkel again on August 6,
2007, stating that he was "dumbfounded as to why [Frenkel's] office would even retain the
remaining interest on account, despite [Amusement's] request for its return."  (P. Ex. 51.)
Sragow once again demanded that Frenkel return any Amusement funds that Frenkel held in his
possession, threatening that "[i]f I do not receive in my office within 48 hours either the funds or
an explanation why you have not released the funds, we will have no choice but to commence
litigation."  (*Id.*)

Amusement did not, however, file a complaint alleging that the funds were improperly
disbursed until December 27, 2009, four months after Sragow's letter was sent and five months
after the funds were released.  (*See* D. Ex. BB.)

### b.   *Amusement Treats the Transaction as an Operative Transaction*

Instead, for much of the five-month period, for all intents and purposes, Amusement
treated the transaction as operative and sought to profit from it.  Amusement's correspondence
refers to the withdrawn escrow as an operative loan that had to be repaid.  For example, on
September 11, 2007, while Stern was seeking to obtain refinancing, Robert Friedman, a principal

at Bankers Capital, sent an email to Stern—on Sragow's instruction—recommending that Stern

obtain refinancing quickly because the 60-day "deadline to buy [Amusement] out was fast

approaching." (D. Ex. V.)  On November 15, 2007, Amusement assigned the two promissory

notes it received from Stern (the $13 million and $15 million notes) to Amusement's affiliate,

Practical Finance.  (D. Ex. Y.)  Moreover, on November 15, 2007, Amusement sent a letter to

Stern and First Republic, among others, informing them that Stern and First Republic were in

default of their agreement with Amusement, and demanding that Stern and First Republic Group

Realty immediately deliver all deeds to the eleven shopping centers.  (D. Ex. Z.)

As the deadline for repayment of the loan approached and passed, Amusement became

keenly aware of the windfall Amusement stood to reap under the operative loan—ownership of

the entire Colonial Portfolio—if Stern defaulted on the $15 million promissory note.  In an email

sent to Steven Alevy and Allen Alevy on October 24, 2007, after the deadline for repayment of

the loan had passed, Robert Friedman, a principal at Bankers Capital, cautioned the Alevys about

suing Mark Stern, because:

> I think if we sued him for being in default of our loan, which he clearly is at this point, he
> may try to find someone else to take our 13 or 15 million dollars and give the new
> investor 10% equity in the 11 properties—or some % that is significantly lower than the
> percentage due to us if he would default (i.e. all of it) . . . .  If he fails to take us out by
> finding new investors, we will take over all the properties and begin the evaluation
> process of what we would sell.

(D. Ex. W.)

Amusement's correspondence after the 60-day deadline for repayment passed repeatedly

refers to the Portfolio as Amusement's own.  On October 24, 2007, Allen Alevy sent an email to

Steven Alevy, with "Colonial" in the subject line, expressing concern about the financial

performance of what Allen Alevy now claimed were Amusement's properties.  As Allen Alevy

stated in the email:  "Since we bought the mall, we've lost 2 or 3 tenants."  (D. Ex. W.)

Similarly, on October 29, 2007, Jon Feirman of Bankers Capital sent an email to Amusement's

Controller, Vincent Ferreira, with copies to Allen Alevy and Steven Alevy, advising that "[i]t

looks like overall we've lost approximately $330,000 in annual income" and that he had

compiled various operational information for the Properties "since [Amusement] took over

management of the properties." (D. Ex. X.) Finally, on December 10, 2007, after more than 120

days had passed since the funds were released and Amusement had not yet been paid the $15

million under the note from Stern, Allen Alevy wrote an email to Steven Alevy stating, in part:

"I asked [Friedman] what happened to our 100%, since Stern did not pay us back in 60 days . . . .

I think everyone on Stern's side is going to have a hard time explaining to a judge why we didn't

get our partnership; why we don't now own 100% . . . ." (D. Ex. AA.) Indeed, at the evidentiary

hearing, Allen Alevy acknowledged that by December 2007 Amusement believed that

Amusement owned 100% of the equity interest of the entity that owned the Portfolio. (1T:41-

43.)

Allen Alevy also acknowledged that, throughout this time, from the funds' release in July

2007 until Amusement's District Court Action in December 2007, Amusement did not know the

status of the reserve account funds that had been released from the escrow. (1T:47.)

   c. *Amusement's District Court Action*

On December 27, 2007, Amusement filed an action against Stern and First Republic,

among others, captioned *Amusement Industry, Inc. d/b/a Westland Industries v. Moses Stern,*

*a/k/a Mark Stern, et al.*, 07 Civ. 11586 (S.D.N.Y.) (the "District Court Action"). (D. Ex. BB.)

The first cause of action in Amusement's complaint sought a declaration that, pursuant to its

contract, Amusement owned 100% of the equity of the Debtor and/or the Portfolio: "In

particular, Plaintiffs desire a declaration that Amusement owns First Republic LLC and owns the eleven portfolio companies . . . ." (D. Ex. BB, ¶ 72.)

Amusement's District Court Action contained numerous causes of action against Stern, Safrin, Frenkel, and LTA relating to the ostensibly improper disbursement of the escrowed funds. The eleventh cause of action, for example, alleged that Frenkel and LTA had breached their agreement with Amusement "by releasing Amusement's escrowed $13 million without the authorization of Allen Sragow or Allen Alevy." (*Id*. ¶ 154.) The thirteenth cause of action alleged that Frenkel and LTA had breached a fiduciary duty to Amusement by releasing the escrow for First Republic's purchase of the Portfolio, without Allen Sragow or Allen Alevy's authorization, and "before Amusement completed memorialization of its agreements with Stern, Safrin and First Republic LLC," causing Amusement to suffer damages. (*Id*. ¶¶ 162-63.)

Notably, for each and every cause of action relating to the ostensibly improper disbursement of the funds, Amusement sought monetary damages. (*Id*. 79-86.) Not once, throughout Amusement's District Court Action, for any of its twenty-seven separate and distinct causes of action, did Amusement seek injunctive relief to restrain the use or transfer of the $13 million.

       d. *Citigroup Forecloses on FRGR*

In June 2008, First Republic Group Realty and FRGR commenced an action against Citigroup in New York Supreme Court, seeking a temporary restraining order and a preliminary injunction. On June 19, 2008, the court issued a temporary restraining order enjoining Citigroup from foreclosing on the combined $126 million loan. (D. Ex. DD. at 2.) On October 6, 2008, the state court granted the motion for a preliminary instruction and required First Republic Group Realty and FRGR to secure the injunction with a $5 million undertaking. (D. Ex. CC.) On

January 28, 2009, however, after First Republic Group Realty and FRGR failed to satisfy the October 6, 2008 decision's undertaking requirement, the court granted Citigroup's application to vacate the injunction.  (D. Ex. DD at 3.)

On February 26, 2009, First Republic Group Realty and FRGR filed an emergency application for a temporary restraining order and a preliminary injunction seeking to enjoin Citigroup from foreclosing on the loans.  (D. Ex. DD at 4.)  On February 27, 2009, the state court denied the application for a temporary restraining order and, in a March 9, 2009 memorandum decision, the court denied the order to show cause for a preliminary injunction.  (D. Ex. DD at 4-5, 14.)

On February 19, 2009, during the litigation between the First Republic entities and Citigroup, after the state court granted Citigroup's application to vacate the injunction, Amusement wrote a letter to Citigroup and advised Citigroup that the reserve accounts held by Wachovia for Citigroup's benefit were initially funded entirely by Amusement and demanded that Citigroup preserve the funds for Amusement's benefit.  (P. Ex. 61.)  Amusement requested that Citigroup "either immediately disburse $6,337,047.62 to Amusement for the return of its funds, or consider the funds controlled by Citigroup at Wachovia to be held in trust for the benefit of Amusement."  (*Id.*)

On June 10, 2009 and June 16, 2009, after the state court denied First Republic Group Realty's and FRGR's order to show cause for a preliminary injunction, Citigroup served Notices of Disposition of Collateral, announcing a public sale on June 23, 2009 of the collateral for the mezzanine loan to FRGR, consisting of the equity interest in First Republic Group Realty.  (P. Ex. 62.)

On June 22, 2009, Amusement commenced a state court action against Citigroup in New York Supreme Court. (Complaint, D. Ex. FF.) In the complaint, Amusement alleged that at the time Citigroup executed the Loan Agreement and the Mezzanine Loan Agreement, Citigroup knew that Amusement had supplied additional funds to allow First Republic Realty Group to complete the transaction and that Amusement had supplied its funds first. (*Id.* ¶¶ 45-47.) The complaint noted that, as part of its transaction with First Republic Realty Group, Amusement required copies of special warranty deeds for each of the eleven properties and First Republic Realty Group executed and delivered copies of those deeds to Amusement on or about July 12, 2007. (*Id.* ¶¶ 48-49.) Moreover, as security for the transaction, First Republic Realty Group's principals executed assignments of their interests in the entities that wholly owned the corporate structure holding the real properties that comprise the Portfolio. (*Id.* ¶ 50.) Amusement argued that if Citigroup was permitted to foreclose on the First Republic membership interests and/or permitted to foreclose on the real properties that formed the Portfolio to the exclusion of Amusement, Citigroup would be unjustly enriched and the interests that had been provided to Amusement would be rendered worthless. (*Id.* ¶¶ 54, 56.) Amusement also argued that if Citigroup is permitted to obtain the release of the funds held in the reserve accounts related to the Portfolio, Citigroup would be unjustly enriched. Accordingly, among other things, Amusement sought a judgment declaring that "Amusement's interest in each of the individual properties has priority over Citigroup's security interest" and monetary damages "to the extent that Citigroup was unjustly enriched by Amusement's funds." (*Id.*) Amusement did not, however, seek any kind of injunctive relief.

First Republic Group Realty filed this chapter 11 case on June 22, 2009, and also filed an adversary proceeding against Citigroup on that same day, in a last ditch effort to block

Citigroup's foreclosure sale.[19]  (*See First Republic Group Realty, LLC v. Citigroup Global Markets Realty Corp. (In re First Republic Group Realty, LLC)*, Case No. 09-01306 (Bankr. S.D.N.Y.) (Case No. 09-01306, ECF # 1).  On June 23, 2009, my colleague, Judge Arthur Gonzalez, denied an emergency motion to enjoin the foreclosure sale.  (*Id.*, ECF # 4.)

On June 23, 2009, pursuant to its Notices of Disposition of Collateral, Citigroup held a public sale of the collateral and it acquired the collateral for a credit bid of $1,000.  (P. Ex. 62.)

  e. *Amusement's Claim in the First Republic Group Realty Bankruptcy Proceeding*

On October 22, 2009, Amusement filed a proof of claim in this case for $15,375,420.55. (D. Ex. GG.)  The proof of claim describes the basis of the claim as "Trust conversion and equitable lien."  (*Id.*)  In an attachment to the proof of claim, titled "Itemized Statement," Amusement provided a breakdown of its proof of claim: a $13,000,000 "Principal" and $2,375, 420.55 as "Interest for July 13, 2007 to June 22, 2009."  (*Id.*)  Amusement designated the claim as a claim secured by real estate, the value of which was described as being in excess of the claim.  (*Id.*)  The claim was signed by Allen Alevy.  (*Id.*)

  f. *The Reserve Accounts and Amusement's Motion for a Preliminary Injunction*

As of June 23, 2009, First Republic Group Realty's reserve accounts had the following balances:

| | | | |
|---|---|---|---|
| i. | Capital Improvements Reserve Account | $2,450,771.81 | (Stip. Facts at ¶ 9.); |
| ii. | Interest Reserve Account | $671,262.98 | (*Id.* at ¶ 10); |
| iii. | Environmental Reserve Account | $0.00 | (*Id.* at ¶ 11); |
| iv. | Tax Escrow Account | $553,500.65 | (*Id.* at ¶ 12). |

---

[19] As already indicated, in an unsuccessful effort to stall Citigroup's foreclosure sale, FRGR filed its bankruptcy case under chapter 11 on March 9, 2009.  Only when that strategy failed did Stern cause First Republic Group Realty to file its bankruptcy case under chapter 11.  *See supra* n.4.

The aggregate amount of $3,675,535.41 remaining in these accounts can be traced to the $6,337,047.62 of the escrow funds originally transferred to Wachovia on July 13, 2007. (*Id.* at ¶ 13.)   On October 23, 2009, Amusement filed the present motion requesting that the Court grant a temporary restraining order and preliminary injunction enjoining the Debtor from depleting the reserve accounts of cash collateral below $6,387,047.62, or alternatively below their lowest intermediate balance, through trial or other merits disposition of the adversary complaint.  (ECF #6.)  Amusement argued that such relief was necessary "to prevent any further use of Amusement's funds or wasting of Amusement's assets, and to ensure that a final merits disposition in favor of Amusement will not be merely academic."  (*Id.*, Mem. in Supp. at 2.)

## III.DISCUSSION

### A.      Preliminary Injunction and Temporary Restraining Order

The Second Circuit recognizes a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies" that should be granted only in extraordinary circumstances. *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985); *see also Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) ("'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'") (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)) (emphasis in the original).

The Second Circuit's standard for obtaining a preliminary injunction is well established. To obtain a preliminary injunction, a movant must show that: (a) it will suffer irreparable harm in the absence of an injunction, and (b) either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a

balance of hardship tipping decidedly in the movant's favor. *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009).

In the present case, for the following reasons, Amusement has failed to satisfy any of the required elements for a preliminary injunction. Therefore, Amusement's request for a preliminary injunction must be denied.

1.    <u>Irreparable Harm</u>

Within the Second Circuit's formula, "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Grand River Enterp. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal citations and quotations omitted). The moving party must first demonstrate that irreparable injury is likely "before the other requirements for the issuance of an injunction will be considered." *Id.*; *see also Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) ("To establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'") (quoting *Consol. Brands, Inc. v. Mondi,* 638 F. Supp. 152, 155 (E.D.N.Y.1986)); *Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*, No. 97 CIV. 3075(RWS), 1998 WL 67663, *5 (S.D.N.Y. Feb. 18, 1998) ("the movant must show that irreparable harm is likely, not merely possible").

An irreparable harm is one that cannot be remedied through a monetary award. *See Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 82 (2d Cir.1994) (no irreparable injury where plaintiff "could be adequately compensated with money damages if it were to prevail on these claims at trial"). Accordingly, when a party has alternate, monetary remedies for harm suffered, such harm is not irreparable. *See Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991) ("[W]hen a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary remedy of a preliminary

injunction should be granted."); *JSG Trading Corp. v. Tray-Warp, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (denying preliminary injunction and holding that "[I]rreparable injury is one that cannot be redressed through a monetary award"); *see also Federal Ins. Co. v. Time Warner Inc.*, No. 06 Civ. 740(SWK), 2006 WL 1026466, *2 (S.D.N.Y. Apr. 19, 2006) ("The most Federal stands to lose . . . is $25 million, the money it advanced to Time Warner.  Any harm sustained by Federal, therefore can be redressed financially and cannot serve as the basis for injunctive relief.").

An alternate monetary remedy must be actually and not theoretically available to a plaintiff to undermine a harm's irreparability.  *See Drobbin v.  Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986) ("Where a plaintiff's injury is theoretically compensable in money damages, but as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect plaintiff from irreparable injury."); *see also Brenntage Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999) (affirming entry of a preliminary injunction because defendant's insolvency established irreparable harm to the plaintiff in that plaintiff was unlikely to be made whole after the litigation); *III Finance Ltd. v. The Aegis Consumer Funding Group, Inc.*, No. 99 CIV. 2579, 1999 WL 461808, *6 (S.D.N.Y. July 2, 1999) (granting injunctive relief because defendant "ha[d] no other sources of income or cash on hand," and thus there was a risk that the plaintiff would be unable to recover damages).  Alternate monetary remedies can, however, include viable monetary remedies that the plaintiff has against solvent third-parties, stemming from the same transaction or occurrence, to ultimately relieve the same harm, and the likelihood of such recovery would not be weakened by the denial of the injunction.  Accordingly, even if the defendant in a particular action is insolvent, if the plaintiff has monetary recourse stemming from the same transaction or occurrence against a third-party defendant that would relieve the

same harm that the plaintiff is seeking to enjoin, the plaintiff has an alternate monetary remedy and the harm is not irreparable.  *Cf. Brenntage Int'l Chemicals*, 175 F.3d at 250 (although solvent defendants were available, the plaintiff did not have sufficient alternatives because the claims against those defendants were "significantly weaker" than the claims against the insolvent defendant); *Drobbin*, 631 F. Supp. at 912 (monetary award not an alternate remedy if shares were to be transferred prior to judgment because neither of the defendants had sufficient assets to compensate the plaintiff *and* plaintiff could not sue third-party transferees because the transferees would likely take title free and clear of liens).

A claim of irreparable harm is undercut by a party's unreasonable delay in seeking injunctive relief.  *See Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir. 1995) ("[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief.  Though such delay may not warrant the denial of ultimate relief, it may, standing alone, preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.") (internal citations and quotations omitted); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").  A delay's reasonableness, for the purposes of an irreparable harm analysis, is evaluated in the context of the action and whether any harm could result from such a delay.  A party's delay in seeking relief, in the face of potential harm caused by such a delay, vitiates a party's claim that such harm is irreparable.  *See Tough Traveler*, 60 F.3d at 968 (in patent

infringement case, while delay in seeking a preliminary injunction may have been reasonable when the infringing product was not for sale, it was not reasonable during the period of time that the infringing product was for sale); *Citytrust*, 756 F.2d at 276 (noting that, specifically in a trademark infringement case, "[s]ignificant delay in applying for injunctive relief . . . tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement").

Here, Amusement's multiple claims for money damages against five parties (and potentially others) in connection with the allegedly improper disbursement of the funds undermine Amusement's claim that it would suffer irreparable harm in the absence of a preliminary injunction. Although Amusement argues that First Republic is on the brink of insolvency and, accordingly, would be unable to compensate Amusement for the loss of the funds, Amusement can and has pursued numerous monetary claims, against multiple solvent parties, all arising from the allegedly improper transfer of its funds, that would compensate Amusement for the loss of the funds. Notably, Amusement presently has multiple pending claims in District Court against Frenkel and LTA related to the improper release of Amusement's funds, and against Stern and Safrin for the improper conversion of those funds. These claims would not be substantively weakened if injunctive relief is denied.

Amusement's claim that it will be irreparably harmed without a preliminary injunction is also undermined by Amusement's unreasonable delay in seeking injunctive relief following the allegedly improper release of the funds from escrow, despite acknowledging that the funds were at risk of being depleted. On July 16, 2007, only three days after the funds were released, Sragow sent a letter to Friedman and Frenkel advising them that Amusement had not approved the distribution and that the "money [was] now in jeopardy." (D. Ex. T.) Sragow threatened

legal action, writing on July 27, 2007 that "I would rather not file a complaint, but I no longer

see any alternative."  (D. Ex. U.)  On August 6, 2007, clearly upset by what Sragow described as

Frenkel's non-responsiveness, Sragow wrote another strongly-worded letter to Frenkel,

threatening that "[i]f I do not receive in my office within 48 hours either the funds or an

explanation why you have not released the funds, we will have no choice but to commence

litigation."  (P. Ex. 51.)

      Despite Sragow's threats of litigation, Amusement waited five months after the release of

the funds to commence litigation, and waited until the present case—twenty seven months after

the funds were released—to request injunctive relief.  Amusement's delay in seeking injunctive

relief—in the face of a clear and constant danger that the escrow funds would be depleted—

undercuts Amusement's claim that the injunctive relief Amusement seeks is urgently needed and

that Amusement would suffer irreparable harm in the absence of such relief.

      2.    <u>Likelihood of Success on the Merits</u>

      In the alternative, Amusement's request for a preliminary injunction must be denied

because Amusement is unlikely to succeed on the merits of its claim.  Although Amusement

appears not to have given Steven Alevy express authority to authorize the escrow's release, the

Court must also consider whether he had apparent authority, or whether Amusement's conduct

after the funds were released establishes that Amusement's principals viewed the resulting

transaction as an operative, binding transaction and, accordingly, ratified the otherwise

unauthorized release of the escrowed funds.

      *a.  Apparent Authority*

      Apparent authority is "the power held by an agent or other actor to affect a principal's

legal relations with third parties when a third party reasonably believes the actor has authority to

act on behalf of the principal and that belief is traceable to the principal's manifestations."

*RESTATEMENT (THIRD) OF AGENCY* § 2.03 (2006). Courts have established the following two-

prong test for determining if an agent possesses apparent authority. *See Herbert Constr. Co. v.*

*Continental Ins. Co.,* 931 F.2d 989, 993-94 (2d Cir.1991).

First, the principal must have been responsible for the appearance of authority in the

agent to conduct the transaction in question. *See id.*; *see also Fennell v. TLB Kent Co.,* 865 F.2d

498, 502 (2d Cir.1989) ("Second Circuit case law supports the view that apparent authority is

created only by the representations of the principal to the third party, and explicitly rejects the

notion that an agent can create apparent authority by his own actions or representations."); *Ford*

*v. Unity Hospital*, 32 N.Y.2d 464, 473 (1973) ("Rather, the existence of apparent authority

depends on a factual showing that the third party relied upon the misrepresentations of the agent

because of some misleading conduct on the part of the principal–not the agent."); *see also*

*Cooperative Agricole Groupement De Producteurs Bovins De L'Ouest v. Banesto Banking*

*Corp.*, No. 86 CIV. 8921(PKL), 1989 WL 82454, at *14 (S.D.N.Y. July 19, 1989) ("[T]he

authority of an agent . . . can only be established by tracing it to its source in some word or act of

the alleged principal.") (internal citations and quotations omitted). The Second Circuit has

established that a principal's silence in the face of an agent's actions can be sufficient to create

apparent authority. *See Scientific Holding Co. v. Plessey, Inc.,* 510 F.2d 15, 25 (2d Cir. 1974)

("[Apparent authority is created when a principal] remained silent when he had the opportunity

of speaking and when he knew or ought to have known that his silence would be relied upon, and

that action would be taken or omitted which his statement of the truth would prevent, and that

injury of some nature or in some degree would result."); *see also In re Worldcom, Inc.*, 2007 WL

735021, at *5 (Bankr. S.D.N.Y. March 9, 2007) (Gonzalez, J.).

33

Second, the third party must have been reasonable in relying on the representations of the agent. *See Herbert Constr. Co.* 931 F.2d at 993-94; *Hallock v. State*, 64 N.Y.2d 224, 231 (1984) ("a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable"); *RESTATEMENT (THIRD) OF AGENCY* § 2.03, cmt. d ("[i]t is usually a question for the trier of fact whether a reasonable person in the position of a third party would believe that an agent had the authority or the right to do a particular act").  The third party must have actually relied upon the appearance of authority and that any indications that the third party did not rely upon the agent's appearance of authority undermine the third party's claims that the agent possessed apparent authority.

Here, the record is devoid of any act by Amusement that could have or did mislead the Friedman or Frenkel—the individuals directly responsible for the release of the funds—about the scope of Steven Alevy's authority.  To the contrary, Amusement's counsel, Allen Sragow, advised both Stephen Friedman and Ephraim Frenkel that only Allen Alevy or Allen Sragow— not Steven Alevy—could authorize, in writing, a release of the escrowed funds.  Neither Allen Alevy nor Allen Sragow were copied on Steven Alevy's email to Frenkel where Steven Alevy purported to provide written authorization for Frenkel to release the escrow funds.

The record also clearly shows that Frenkel was aware or should have been aware that only Allen Alevy or Allen Sragow—and not Steven Alevy—could  authorize a release of the escrowed funds.  On July 13, 2007, the day the escrow funds were released, Frenkel confirmed receiving instructions from Sragow that he could not release the escrow without Sragow's written authorization.  (D. Ex. O)  When Friedman emailed Frenkel stating "YOU CAN RELEASE THE ESCROW," Frenkel replied that, although he had received verbal authorization to release the escrow from Steven Alevy, he was waiting for authorization from Allen Sragow: "I

34

really would like a release from Steve *and Sragow*." (D. Ex. N.) (emphasis added))**.** After not

immediately receiving Sragow's authorization from Steven Alevy, Frenkel even took the step of

emailing Sragow's office to request Sragow's written authorization "[p]ursuant to [Sragow's]

instructions." (D. Ex. O.) Finally, even after Steven Alevy provided Frenkel with written

authorization to release the escrow, Frenkel still remained uncomfortable with releasing the

escrow, emailing Alevy with an ominous warning that "[w]ires are going to fly in minutes if not

less." (D. Ex. P.)

The record is also clear that Friedman, despite his testimony to the contrary, was aware or

should have been aware that only Allen Alevy or Allen Sragow—and not Steven Alevy—could

authorize a release of the escrow funds. Sragow sent repeated messages to Friedman and

Frenkel—with copies to Steven Alevy—that written authorization had to be received from

Sragow or Allen Alevy before the funds could be released. (P. Ex. 20; D. Ex. O.) Friedman

confirmed by email that he received and would comply with these instructions. (P. Ex. 20.)

Moreover, when Frenkel advised Friedman on the day of the closing that "I received a phone call

from Steven Alevy, but no email and fax. He also said he would have Sragow send something. I

really would like a release from Steve and Sragow." (D. Ex. N.) Friedman replied: "You do

need [the release] from *them*." (*Id.*) (emphasis added).)[20]

b. *Subsequent Ratification of an Unauthorized Act*

Ratification is the affirmance of a prior act done by a principal, whereby the prior act is

given effect as if done by an agent acting with actual authority. *RESTATEMENT (THIRD) OF*

*AGENCY* § 4.01(1). A principal may ratify and thereby become liable for the act of an agent even

if the act was initially unauthorized if the principal manifests assent that the act shall affect the

---

[20]    The Court is convinced that the "true" story about the circumstances surrounding the release of funds from
escrow has not been told, at least not in court.

35

principal's legal relations, or engages in conduct that justifies a reasonable assumption that the

principal so consents. *Id.* at §§ 4.01(2)(a)-(b). In order to ratify a prior transaction, however, the

principal must have knowledge of all the material facts involved in the transaction. *See Breen*

*Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 773 (2d Cir. 1972) ("[R]atification can only

occur when the principal, having knowledge of the material facts involved in a transaction,

evidences an intention to ratify it."). Should the principal have such knowledge, the principal's

ratification can be found by *any* conduct by the principal that manifests the principal's consent to

be a party to the transaction. RESTATEMENT (THIRD) OF AGENCY § 4.01, cmt. b ("The sole

requirement for ratification is a manifestation of assent or other conduct indicative of consent by

the principal.").

Accepting the benefits of an agent's unauthorized act, where the benefit could not have

been attained without the unauthorized act, can manifest a principal's consent to be a party to the

transaction. *See* RESTATEMENT (SECOND) OF AGENCY § 98 (1958) ("The receipt by a purported

principal, with knowledge of the facts, of something to which he would not be entitled unless an

act purported to be done for him were affirmed, and to which he makes no claim except through

such act, constitutes an affirmance unless at the time of such receipt he repudiates the act."); *In*

*re South African Apartheid Litig.*, 633 F. Supp. 2d. 117, 121-22 (S.D.N.Y. 2009) ("Even if a

purported agent lacks actual authority, a principal is nonetheless liable if it ratified the illegal acts

. . . . The acts of an agent are imputed to the principal 'if the principal adopts the unauthorized

act of his agent in order to retain a benefit for himself.'") (quoting *Munroe v. Harriman,* 85 F.2d

493, 495 (2d Cir. 1936)).

Additionally, it is well-established that the filing of a lawsuit to enforce one's rights

pursuant to a promissory note or other contract given in connection with an allegedly

unauthorized act, ratifies the unauthorized act.  *See IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d. Cir. 1994) ("[O]ne of the most unequivocal methods of showing ratification of an agent's act is the bringing of an action based upon such an act.") (internal citations and quotations omitted); *Simmons v. Thompson*, 29 A.D. 559, 562 (1st Dep't 1898) ("In this case, the corporation, having brought an action upon this note . . . must be deemed to have ratified the contract made by [the alleged unauthorized agent] to procure the giving of the note.  It cannot . . . adopt the note, and refuse to adopt the contract by which it was procured.").

Moreover, conduct far less direct than filing a lawsuit can constitute ratification.  A principal's silence or acquiescence in the face of knowledge of an unauthorized act can also constitute ratification of the act.  *See Scientific Holding*, 510 F.2d at 25 ("Where a person wronged is silent under a duty to speak, or by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself or so as to affect the rights or relations created by it between the wrongdoer and a third person, he acquiesces in and assents to it and is equitably estopped from impeaching it.") (internal citations and quotations omitted); *see also Monarch Insurance Co. of Ohio v. Insurance Corp. of Ireland Ltd.,* 835 F.2d 32, 36 (2d Cir. 1987) (the intention to adopt the unauthorized arrangement can be "'implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events'") (quoting *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F. Supp. 748, 752 (S.D.N.Y. 1968), *rev'd on other grounds,* 407 F.2d 521 (2d Cir. 1969)).

In the immediate aftermath of the release of the funds from escrow, Amusement explicitly held open the possibility that Amusement would subsequently ratify the release. Although Sragow stated that neither Sragow or Allen Alevy had approved the funds' release in accordance with Amusement's instructions, and that Sragow deemed the funds' release improper, Sragow raised the possibility that Amusement would nevertheless ratify the disbursement if First Republic would provide the *additional* documents that Amusement requested.  (D. Ex. T.)  In the same letter in which Sragow warned that Amusement's money was "now in jeopardy," Sragow provided First Republic with a list of *newly* required documents and stated that "we have once again listed the elements necessary for Amusement to *now* ratify the disbursement."  (*Id.*) (emphasis added).

Indeed, in the days and months that followed, Amusement exhibited conduct demonstrating that, despite its initial objections, Amusement deemed the transaction resulting from the ostensibly invalid disbursement as an operative and valid transaction.  As the promissory note's 60-day deadline approached, Robert Friedman, a principal at Bankers Capital, emailed Stern on Sragow's instructions and recommended that Stern obtain the refinancing quickly since the 60-day "deadline [to repay Alevy] was fast approaching."  (D. Ex. V.)  And, as with any other operative loan, Amusement assigned the two promissory notes it received from the Debtor (the $13 million and $15 million notes) to Amusement's affiliate, Practical Finance, and, after the 60-day deadline for the note's repayment had passed, Amusement sent a letter to Stern and First Republic, among others, stating that Stern and First Republic were in default of their agreement with Amusement.

Amusement recognized and sought to reap its perceived benefits from the Debtor's default on the operative loan—namely, Amusement's ownership of the entire Portfolio.  After

38

the 60-day deadline for repayment of the loan had passed, Amusement officials referred to the
Portfolio's properties as their own and were increasingly attentive to their financial performance.
Tellingly, on December 10, 2007, after more than 120 days had passed since the release of the
funds, Allen Alevy wrote an email to Steven Alevy stating, in part: "I think everyone on Stern's
side is going to have a hard time explaining to a judge why we didn't get our partnership; why
we don't now own 100% . . . ."  (D. Ex. AA.)  Amusement cannot have its cake and eat it too—it
cannot welcome the benefits of an operative transaction without recognizing the transaction as an
operative transaction.  Amusement's attempt to cash in on the potential windfall associated with
the transaction constituted a ratification of the transaction.

Finally, Amusement's District Court Action against Stern and First Republic, among
others, seeking to enforce the transaction resulting from the ostensibly unauthorized release of
funds, is yet further proof that Amusement subsequently ratified the transaction.  The first cause
of action in Amusement's District Court complaint sought a declaration that, pursuant to its
contract—which would only be operative if Amusement subsequently ratified the funds'
release—Amusement owned 100% of the Debtor's equity and the Portfolio.   (D. Ex. BB at ¶
72.)

3.   Serious Questions Going to the Merits and Balance of Hardships

Irreparable injury is a requirement for issuing a preliminary injunction and the Court has
found it lacking here.  While the Court need go no further in its analysis, as explained above the
Court has also concluded that Amusement has failed to establish probability of success on the
merits.  The Court likewise concludes that Amusement has failed to carry its burden of
demonstrating that there are sufficiently serious questions going to the merits to make them a fair
ground for litigation and that a balance of hardship tips decidedly in Amusement's favor.  *See*

*Zino Davidoff SA v. CVS Corp.,* 571 F.3d at 242; *Federal Express Corp. v. Federal Express, Inc.,* 201 F.3d 168, 173 (2d Cir. 2000).

The Court's analysis above of probability of success—specifically on the issue of ratification—leaves scant room, if any, for Amusement to argue, based on the facts found by the Court, that it did not ratify the transaction with Stern whereby it accepted and has sought to enforce the promissory notes given by Stern in exchange for advancing $13 million.  Certainly, Amusement has not established serious questions making them a fair ground for litigation. Additionally, in light of the Court's finding that Amusement has failed to demonstrate the likelihood of irreparable injury, Amusement has also failed to show that the balance of hardships tips decidedly in its favor.  In separate arguments, not currently before the Court, First Republic Group Realty has shown the need to use cash collateral—including, specifically, the funds that Amusement seeks to restrain—for ongoing maintenance and repairs to the eleven shopping centers.  Any future cash collateral motion will have to satisfy additional requirements, but as between Amusement and the Debtor, the balance of hardships clearly tilts in favor of First Republic Group Realty.

## CONCLUSION

For the foregoing reasons, the Court concludes that Amusement has failed to establish

that it is entitled to any preliminary injunctive relief.  Therefore, Amusement's motion for a

preliminary injunction is **DENIED.**

**IT IS SO ORDERED.**

Dated: December 15, 2009
New York, New York

                            **/s/Martin Glenn**
                                 MARTIN GLENN
                    United States Bankruptcy Judge